# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 14-422V
Filed: January 22, 2019
PUBLISHED

| | |
|---|---|
| TAMMY SCHETTL,<br><br>  Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>  Respondent. | Ruling Awarding Pain and Suffering Damages; Complex Regional Pain Syndrome ("CRPS"); Influenza ("Flu") Vaccine. |

*Richard Gage, Richard Gage, P.C., Cheyenne, WY, for petitioner.*
*Justine Walters, U.S. Department of Justice, Washington, DC, for respondent.*

### RULING AWARDING PAIN AND SUFFERING DAMAGES[1]

**Dorsey**, Chief Special Master:

On May 15, 2014, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered Complex Regional Pain Syndrome ("CRPS") as a result of her October 4, 2011 influenza ("flu") vaccination. Amended Petition (ECF No. 29) at 1-2. Respondent conceded that petitioner is entitled to compensation, and a Ruling on Entitlement was issued on

---

[1] The undersigned intends to post this Ruling on the United States Court of Federal Claims' website. **This means the Ruling will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access. Because this Ruling contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

August 7, 2018. Because the parties had been unsuccessful in resolving pain and suffering damages, a damages hearing was held on August 9-10, 2018.

After reviewing the medical records, affidavits, expert reports, and other records filed, as well as the testimony presented at the damages hearing, the undersigned finds that petitioner should receive an award for actual pain and suffering in the amount of $200,000.00 and an award for future pain and suffering in the amount of $10,000.00 per year, for petitioner's remaining life expectancy of 33 years.[3] The total award for actual and future pain and suffering is capped at the statutory maximum of $250,000.00.[4]

## I. Procedural History

Tammy Schettl filed her petition on May 15, 2014, alleging that the influenza vaccination she received on October 4, 2011, caused her to develop brachial neuritis. Petition at 1. The case was assigned to Special Master Laura Millman. Petitioner filed medical records and, subsequently, a statement of completion. The initial status conference was held June 25, 2014, during which the special master and respondent identified the need for additional medical records. *See* Order dated June 25, 2014 (ECF No. 9). Additional records were filed, and respondent filed his Rule 4(c) Report on August 13, 2014, asserting that the case was not appropriate for compensation. Rule 4(c) Report (ECF No. 12) at 2.

After three extensions of time, petitioner filed an expert report by Dr. Marcel Kinsbourne and supportive medical literature. Pet. Exs. 8-16. In his expert report, Dr. Kinsbourne opined that Ms. Schettl's diagnosis was not brachial neuritis, but CRPS Type 1. Pet. Ex. 8 at 3. Dr. Kinsbourne cited medical literature with case reports of post-vaccination CRPS thought to be caused by mechanical trauma due to intramuscular injection. *Id.* at 6-7. Dr. Kinsbourne opined that minor trauma, like that caused by vaccination, can cause CRPS, and that it did in fact cause Ms. Schettl's CRPS. *Id.* at 8.

Petitioner was ordered to file an amended petition, which she did on December 12, 2014. Amended Petition (ECF No. 29). In her amended petition, Ms. Schettl alleged that she suffers CRPS as a result of the flu vaccine she received on October 4, 2011. *Id.* at 1-2. Respondent was ordered to file an amended Rule 4(c) Report, which was filed on January 28, 2015. Amended Rule 4(c) Report (ECF No. 33). In his amended Report, respondent agreed that petitioner was entitled to compensation for her CRPS. *Id.* at 2-3.

The case moved to the damages phase. Counsel obtained life care plan experts, and petitioner filed additional medical records, statements from her treating physicians, and other supportive evidence. The parties were unable to reach an agreement as to the amount of pain and

---

[3] Based on petitioner's birth date of September 9, 1967, petitioner is expected to live for approximately 33 additional years. *See Nat'l Ctr. for Health Statistics*, *United States Life Tables, 2015* (2018) at Table A.

[4] *See* § 15(a)(4).

2

suffering damages, and the case was set for a two-day damages hearing on July 25-26, 2019.[5] Due to the anticipated retirement of Special Master Millman in May 2019, the undersigned reassigned the case to her own docket on January 16, 2018. A Ruling on Entitlement was issued on August 7, 2018. Ruling dated Aug. 7, 2018 (ECF No. 116). The damages hearing was rescheduled for August 9-10, 2018.

After the hearing, the parties requested to file post-hearing briefs regarding petitioner's pain and suffering damages. Order dated Aug. 13, 2018 (ECF No. 119) at 1. Petitioner was ordered to file chiropractic records, as well as information related to her settlement with Olmstead County Public Health Services[6] arising out of the administration of her flu vaccine.[7] *Id.* at 2. The parties were also ordered to work together to resolve differences between their respective life care plans. *Id.* at 1-2.

Petitioner filed her post-hearing memorandum on September 12, 2018, and respondent filed his on November 26, 2018. Petitioner also filed the insurance policy governing her settlement with Olmsted County Public Health Services, the declarations associated with that insurance policy, and updated information regarding her out-of-pocket expenses. *See* Pet. Exs. 63-65. The parties were given additional time to file supplemental briefs addressing the new evidence.

The issue of an appropriate award for actual and future pain and suffering is now ripe for resolution.

## II.   Factual History

### A.  Summary of Medical Records

Ms. Schettl was born on September 9, 1967, and she was 44 years old when she received the flu vaccine at issue. Her past medical history is significant for "gastric ulcer, hiatal hernia, left foot fracture, menorrhagia, left hand ganglion cyst and tubal ligation." Pet. Ex. 8 at 1. She had no history of problems with her right or left shoulder. On October 4, 2011, she received a flu vaccine in her right arm. Pet. Ex. 1 at 1.

---

[5] Petitioner initially asserted a loss of earnings claim, but she withdrew that claim on August 6, 2018. *See* Pet. Status Report filed Aug. 6, 2018 (ECF No. 115).

[6] Other released entities included "Columbia Casualty Company and any CNA Entity." Pet. Ex. 19 at 2.

[7] In September 2015, Ms. Schettl resolved her claim against Olmsted County Public Health Services for $58,270.07. *See* Pet. Ex. 19. The claim was paid by Columbia Casualty Company, the underwriting company for Olmsted County Public Health Services. *Id.* The undersigned will issue a separate ruling determining whether this settlement should offset petitioner's Vaccine Program award.

Approximately one week later, on October 11, 2011, Ms. Schettl presented to her primary care provider at Olmstead Medical Center ("OMC"), complaining of right upper arm pain. Pet. Ex. 5 at 49. The note from that visit documents that petitioner had warmth, swelling, and induration at the vaccine injection site. *Id.* Nurse Practitioner Penny L. Flavin diagnosed Ms. Schettl with a reaction to the flu vaccine and prescribed Keflex, an antibiotic. *Id.* at 50.

Ms. Schettl returned to OMC on October 18, 2011, and was seen by Dr. Mark Stenberg. Pet. Ex. 2 at 2-4. At that visit, Ms. Schettl complained that it felt like she had been "punched in the arm" and that she had a burning sensation in all the muscles around that area. *Id.* at 2. She had been in pain since receipt of the vaccine. *Id.* Dr. Stenberg documented that Ms. Schettl was "in a lot of discomfort with her right arm." *Id.* at 3. He diagnosed her with a "reaction to the flu shot, right arm" and suggested that she had a "fasciitis-like syndrome."[8] *Id.* Dr. Stenberg prescribed gabapentin and referred petitioner to physical therapy. *Id.* at 3-4.

On October 19, 2011, Ms. Schettl attended her first physical therapy ("PT") appointment. Pet. Ex. 2 at 11. Her pain at that time was documented as ranging from 2/10 to 7/10. *Id.* She had pain at night, while driving, and while sitting at work. *Id.* She was limited in her ability to perform all activities of daily living ("ADL"). *Id.* at 12. On November 3, 2011, the physical therapist documented that Ms. Schettl had a squeezing feeling in her arm, accompanied by sharp burning, pain, and tightness. *Id.* at 26. On November 7, her pain was documented as 5/10. *Id.* at 29. A neoprene compression sleeve was recommended. *Id.* at 30. Two days later, the physical therapist documented a phone call with Ms. Schett, during which she described being "in so much pain with her arm she can't stand it." *Id.* at 32. The next day, November 10, she was seen again at OMC, and her pain was documented as 7/10. *Id.* at 34.

Ms. Schettl was referred to Dr. Borders-Robinson, a neurologist, for a consult that took place on November 29, 2011. Pet. Ex. 2 at 45-48. Dr. Borders-Robinson documented that Ms. Schettl reported very significant hot and burning pain that was "very disabling." *Id.* at 45. Ms. Schettl was quite frustrated and almost tearful. *Id.* Dr. Borders-Robinson noted that Ms. Schettl had "developed swelling over the proximal metacarpal phalangeal joints, especially involving the 2nd and 3rd digits on the right hand . . . [and] coldness in her hand and . . . a lack of grip strength." *Id.* A right extremity examination found "redness around the triceps area and some redness over the forearm," as well as "swelling over the proximal metacarpal phalangeal joints." *Id.* at 47. A sensory exam also revealed "hypersensitivy, hyperesthesia to tactile and pinprick over the right arm." *Id.* Dr. Borders-Robinson concluded that Ms. Schettl had "some features of early stage I chronic regional pain syndrome including swelling, decreased motility, chronic ongoing pain and some temperature changes of the skin of the right hand." *Id.*

At physical therapy visits in December 2011, Ms. Schettl's pain was noted to be interfering with her ability to work. Pet. Ex. 2 at 55. On December 9, Ms. Schettl reported that although a Lidoderm patch had helped some, writing and using her computer mouse were difficult, and her pain was always present. *Id.* at 53.

---

[8] "Fasciitis" refers to inflammation of the fascia, "a sheet or band of fibrous tissue such as lies deep to the skin or forms an investment for muscles and various other organs of the body." *Dorland's Illustrated Medical Dictionary* 679, 684 (32d ed. 2012).

4

Ms. Schettl had a Hand Clinic consultation at the Mayo Clinic on February 1, 2012. Pet. Ex. 3 at 1-2. At that visit, she reported "severe sleep disturbances." *Id.* at 1. In June 2012, a PT note stated that Ms. Schettl was unable to write, and she felt that it was getting worse. Pet. Ex. 2 at 87. That same month, she was seen by Dr. K.M. McEvoy, who noted that Ms. Schettl was "progressively frustrated and distraught over the pain and limitations . . . on her activities. She has continued to work, but her leisure activities are severely impacted." Pet. Ex. 3 at 7. On August 30, 2012, she was seen by Susan J. Utesch, RN, at the Pain Rehabilitation Center for her chronic right upper extremity pain. *Id.* at 17. Ms. Utesch noted that Ms. Schettl's pain had impacted her ADLs, physical activity, exercise, socialization, relationships, hobbies, and leisure. *Id.*

At her annual examination on September 17, 2012, Ms. Schettl was noted to be "cheerful and conversational." Pet. Ex. 2 at 104. During her endocrinologist visit on September 20, 2012, Dr. Kimberly McKeon noted that Ms. Schettl reported good energy levels and that she was "always on the go." *Id.* at 107. She also reported that she was walking, cycling, biking, snowmobiling, four-wheeling, and jet skiing on a regular basis. *Id.* at 108. At an appointment with her primary care provider ("PCP") on October 18, 2012, there is no mention of shoulder or arm pain or other problems. *Id.* at 115. In contrast, an October 2012 physical therapy discharge summary, summarizing 34 visits from October 19, 2011, through June 14, 2012, indicated that at the last visit on June 14, 2012, Ms. Schettl continued to have pain that was not significantly improved by physical therapy. *Id.* at 120. "Overall, [the] patient had not had resolution of pain or signs and symptoms 8 months after being initially treated and had only demonstrated temporary positive response to . . . iontophoresis." *Id.*

On February 27, 2013, Ms. Schettl had a follow-up appointment with Dr. Bengtson at the Hand Clinic. Pet. Ex. 3 at 33-34. She complained of burning pain, most severe in her right lateral upper arm, and extending down to her second and third digits, made worse by vibrations. *Id.* at 33. She reported that she had been unable to ride motorcycles, four-wheelers, and snowmobiles for the past two years. *Id.* Dr. Bengtson told Ms. Schettl that her pain was likely to stay the same. *Id.*

In June 2013, Ms. Schettl had a follow-up visit with Dr. Bryan Hoelzer at the Pain Clinic. Pet. Ex. 3 at 35-38. She reported that her right upper extremity pain was 4/10, but that it could be more severe at times. *Id.* at 35. She was diagnosed with "severe intractable neuropathic pain of the right upper extremity." *Id.* at 38. In July 2013, she was evaluated by Dr. W. Michael Hooten for a spinal cord stimulator.[9] *Id.* at 39-42. Dr. Hooten noted that although Ms. Schettl had ongoing pain, she had continued to work full-time, and that while she enjoyed her work, her right hand became tired when writing or using a computer all day. *Id.* at 39. At home, she reported that she was able to do household tasks, and that she did not necessarily require assistance for them. *Id.* However, she did report difficulty working outdoors, particularly when mowing the lawn. *Id.* She also reported that she was unable to participate in recreational activities. *Id.* at 39.

---

[9] Ms. Schettl's insurance provider denied the request for a spinal cord stimulator trial. Pet. Ex. 3 at 47.

The next year, at Ms. Schettl's visit to Dr. Hoelzer at the Pain Clinic on January 14, 2014, her pain was noted to be mostly unchanged, and she also reported being "exquisitely sensitive to cold temperatures." Pet. Ex. 3 at 52. She underwent a right stellate ganglion block on January 28, 2014, but it was not helpful. *Id.* at 71, 75. Records from later that year, from her visit to Dr. Bengtson on October 17, 2014, showed that she had begun to experience mirror-like symptoms of the left side. Pet. Ex. 6 at 1. Dr. Bengston noted that the mirror symptoms were more typical of CRPS than of the other diagnoses which had been considered. *Id.*

On January 6, 2015, Ms. Schettl had a follow-up visit at the Mayo Clinic, and reported pain that ranged from 4/10 to 7/10. Pet. Ex. 18 at 1. She stated that she enjoyed her work, and that she "typically stays very busy so that she distracts from her pain symptoms." *Id.* at 6. However, Ms. Schettl also described a "significant decline in her ability to cope with her chronic pain" and stated that her pain "steals my joy." *Id.* She was diagnosed with "adjustment disorder with mixed anxiety and depression." *Id.* at 9. At a visit to the Pain Clinic on February 9, 2015, she reported significant progress. *Id.* at 33. She had joined a gym and was working out on Mondays and Tuesdays. *Id.* She stated that she was "happy 75% of the time," but still experienced "sadness, anger, and anxiety related to her pain." *Id.* at 35.

In April 2015, Ms. Schettl experienced left facial pain and was diagnosed with trigeminal neuralgia. Pet. Ex. 18 at 19-20. She was again treated for trigeminal neuralgia in February 2016 and was prescribed Valtrex. Pet. Ex. 21 at 19. In April 2016, she presented to her PCP and was "quite tearful," describing multiple pain issues and concerns. *Id.* at 21. She was prescribed low dose Lexapro. *Id.* at 23. On May 16, 2016, Nurse Practitioner Jeremy Waldo stated that her trigeminal neuralgia was "markedly better" on Lexapro. *Id.* at 24. She was also using a TENS-based pain system called Quell.[10] *Id.* She reported that she had recently been out in her garden planting. *Id.*

Records from 2017 show that petitioner had ten Scrambler Therapy treatments from March 7, 2017, until March 21, 2017. Pet. Ex. 29 at 1-10. At the beginning of the treatment, her pain was 5-6/10 on average, and at the end of therapy, she noted that her pain was 50% decreased, down to 3/10. *Id.* at 1, 10. However, on July 25, 2017, she returned to Dr. Borders-Robinson, who she had not seen since December 2011. Pet. Ex. 30 at 87. She was tearful and very concerned that she was not going to be able to continue working. *Id.*; Pet. Ex. 33 at 1. At her annual PCP exam on October 23, 2017, she reported that "everything is getting worse" and that she was having difficulty focusing. Pet. Ex. 37 at 5. Her Lexapro dose was increased. *Id.* at 9.

The most current medical records filed are from Ms. Schettl's visit at the Mayo Clinic Hand Clinic with Dr. Keith Bengston on April 11, 2018. Pet. Ex. 38 at 2. Dr. Bengtson had not seen Ms. Schettl in about three years. *Id.* She reported her pain at 4/10. *Id.* A physical exam revealed right upper extremity hyperesthesia and carpal tunnel bilaterally. *Id.*

---

[10] Transcutaneous electrical nerve stimulation ("TENS") therapy treats pain through the use of low-voltage electric currents. *Transcutaneous Electrical Nerve Stimulation (TENS)*, The Cleveland Clinic, https://my.clevelandclinic.org/health/treatments/15840-transcutaneous-electrical-nerve-stimulation-tens (last visited Jan. 9, 2019).

In 2016, petitioner filed a letter from her PCP, Nurse Practitioner Jeremy Waldo, APRN, CNP, RN. Pet. Ex. 22. Mr. Waldo briefly summarizes Ms. Schettl's diagnosis and clinical course. *Id.* As for prognosis, he states that "[g]iven the long standing nature of the patient's pain and an exhaustion of treatment options, I do not anticipate a cure. Rather continued progressive pain, unfortunately, appears to be more likely." *Id.*

### B. Ms. Schettl's Testimony

Ms. Schettl resides in Pine Island, Minnesota, south of Minneapolis-St. Paul, where she has been employed by Olmstead County since 1998. Tr. 9, 102-04. In her current position with the County, Ms. Schettl performs assessments of children placed in foster care. Tr. 104. She was 44 years of age when she received her flu vaccine on October 4, 2011, in her right arm, at the Olmsted County Public Health Department. Pet. Ex. 1.

After receiving the flu shot, Ms. Schettl testified that her arm became hard and swollen, and that she had "searing pain." Tr. 10. On October 11, 2011, she went to her PCP, Olmstead Medical Center ("OMC"), and after being told that she might have an infection, antibiotics were prescribed. Tr. 10-11. However, her pain continued. Tr. 11, 13. She had a large lump in her arm, and searing pain, and her arm had a "pulse of its own." Tr. 11.

A week later, her pain continued to worsen. Tr. 13. Her arm was hot, red, and firm. *Id.* Medication had been prescribed, but it was not effective. *Id.* By the next day, October 19, 2011, her pain was unbearable, and she returned to her PCP. *Id.* Approximately every few hours, she felt as if she was "getting punched in the arm." Tr. 14. Her arm felt heavy, "like it was dead," and it "continued to burn and throb." *Id.* She had severe pain if she touched any object that vibrated, like a steering wheel or electric toothbrush. Tr. 15. Ms. Schettl returned to her PCP again on October 21, 2011, with a progression of her symptoms. Tr. 15-16. She was having problems using her hand, her fingers were stiff, and she had decreased dexterity.[11] Tr. 16.

PT was ordered, and Ms. Schettl's first session was November 3, 2011. Tr. 16. At this point in time, she began having sharp burning pain that occurred in waves, approximately ten times a day. Tr. 16-17. Again, she described the pain like begin punched in the arm. She also described the pain like thunder and lightning: the "wide pain" was thunder, and the sharp, shorter pains were lightening. Tr. 16-17. The pain was 24/7. Tr. 18. "It never stopped." *Id.* She ultimately attended 34 PT visits with no relief from her pain. Tr. 23.

On November 29, 2011, Ms. Schettl saw Dr. Borders-Robinson, a neurologist, who suggested that she may have CRPS. Tr. 18-19. Dr. Borders-Robinson informed Ms. Schettl that her condition could take up to one year to resolve, and if it did not resolve within a year, it would probably never resolve. Tr. 19.

By January 2012, Ms. Schettl testified that the pain in her bicep "grew roots, like a tree . . . [and] started branching out, down my forearm, down into the meat of my hand, and then coming out my fingers." Tr. 20. It was as if her pain "came alive." Tr. 20. She also developed

---

[11] Ms. Schettl is right-hand dominant. Tr. 16.

7

hypersensitivity. Tr. 21. If she touched anything that vibrated, it would send "shocking pains up my hand." *Id.* This impacted her ability to drive, and she has not used her right hand to drive since her condition began. Tr. 22.

In October 2014, Ms. Schettl began having similar symptoms on her left side. Tr. 27. On October 17, 2014, she saw a physician at the Mayo Clinic, who told her that she had "mirroring symptoms," which can happen in CRPS. Tr. 26-27. The symptoms in her left arm are similar to those in her right arm, but the pain is not as significant. Tr. 28. The mirroring symptoms sometimes impact her ability to perform self-care, to work, and to get through the day. *Id.*

Ms. Schettl's chronic pain led to mood changes. Tr. 28-29. She testified that she felt tired, crabby, annoyed, angry, frustrated, and anxious. Tr. 28. In January 2015, she sought treatment for these problems. *Id.* She described being in a "vicious circle of pain." Tr. 30. She underwent cognitive behavioral therapy, where she learned about biofeedback and methods for "trying to figure out what your body needs to relax." Tr. 31. Unfortunately, this therapy has not helped her pain. *Id.* Since May 2016, she has taken Lexapro for depression, mood disorder, and anxiety. Tr. 41. She also tried Cymbalta, but she discontinued it after having suicidal thoughts. Tr. 45.

In spring 2014, she developed trigeminal nerve damage in her face, which caused facial pain. Tr. 32. Dilantin was prescribed for her facial pain. Tr. 37. She has tried to discontinue the Dilantin, but she has been unable to tolerate the pain without it. Tr. 37-39. Her arm pain and facial pain "play off each other" such that when her arm is more painful, then her face is also more painful. Tr. 52-53.

Over time, Ms. Schettl's condition has continued to worsen. In addition to the mirroring symptoms on her left side, in July 2015, Ms. Schettl developed numbness in her right hand and finger. Tr. 33-34. In 2016, her medical records reflect that she continued to have chronic pain with aching and sharp pains. Tr. 35. Changes in temperature, especially cold temperatures, are unbearable. Tr. 35-36. Currently, Ms. Schettl continues to have a "slow steady increase of . . . pain," and in her left arm she continues to have "sharp pains, dull pains, pressure, [and] hand pain." Tr. 85.

Over the past seven years, Ms. Schettl has tried many procedures, medications, and therapies to address her chronic pain. She underwent two ganglion blocks. Tr. 47-48. One was done without anesthesia, which she described as "barbaric." Tr. 48-49. Neither procedure afforded any relief. Tr. 49. In 2017, at the Mayo Pain Clinic, she had a "scrambler" procedure, where electrodes were places on her face and arms, and she was given electric shocks every hour, every day, for ten days. Tr. 50. The goal is to "scramble your nerve paths and confuse them and trick your brain into using different nerve paths and to stop feeling the pain." Tr. 50. The procedure did not relieve her pain. *Id.* She has also tried a TENS unit, Lidoderm patches, Voltaren gel, compound creams, iontophoresis, nerve flossing, acupuncture, and medications, including gabapentin, Lyrica, Topamax, Medrol dose pack, and Valium (diazepam). Tr. 60-78. None of these treatments or medications worked, and she had adverse side effects such as hair loss, taste loss, and difficulty finding her words with some of the medications. Tr. 71-78. She also attended a two-day out-patient rehab program where she learned to calm herself and be less

reactive.  Tr. 70.  She also uses distraction to deal with her pain.  Tr. 79.  She stays "super busy" and focuses on distractions like "reading, listening to music, cards, [and] movies."  *Id.*  Ms. Schettl testified that the most difficult time is being alone with her pain.  *Id.*

Before her vaccine injury, Ms. Schettl was very independent.  Tr. 87.  She raised seven foster children, including five foster boys, as a single mother.  *Id.*  She taught them how to fish, jet ski, and ride a motorcycle.  *Id.*  She was a farmer, and she milked 90 cows twice a day.  *Id.*  She drove tractors and bailed hay.  *Id.*  She enjoyed gardening, yard work, guns, and target practice.  Tr. 88-89.  She made jewelry and was a seamstress, and she went snowmobiling, ice fishing, and ice skating.  *Id.*  She loved winter sports.  *Id.*  She mowed her lawn and took care of her own snow removal.  Tr. 147-48.  She can no longer do any of these things.  Tr. 89.  Driving is difficult.  Tr. 93.  For her job, she must travel, and it is very difficult to drive with only one hand on the wheel when it is icy, snowing, or raining.  *Id.*  Housecleaning, particularly vacuuming, is also difficult.  Tr. 95.  She now has help for yard work and housework.  Tr. 96-97.  Her daughter does a lot of housework for her, and she "pretty much helps [Ms. Schettl] with everything."  Tr. 97.

When asked how she feels about having to live with her pain, Ms. Schettl described feeling scared, afraid, and defeated.  Tr. 86.  She was very credible when giving the following compelling and tearful testimony: "I'm hurt and I'm angry that it happened to me, and I wish I wasn't here.  I wish that this never happened.  I wish that I didn't have to go through this.  I think more—the most thing I do feel is – is fear and frustration of what—what my future is going to be."  Tr. 86-87.

### C.  CRPS - Medical Literature and Expert Report of Dr. Marcel Kinsbourne[12]

CRPS Type I is a "debilitating pain syndrome[]" usually associated with a history of trauma.  Pet. Ex. 12 at 1.  It can be seen after even minor trauma, like an intramuscular injection.  *Id.*  The syndrome may cause "significant morbidity and loss of quality of life."  Pet. Ex. 16 at 1.  "There is no correlation between the severity of the initial injury and the ensuing painful syndrome."  Pet. Ex. 12 at 1.

In CRPS, pain may vary "in quality from a deep ache to a sharp stinging or burning sensation."  Pet. Ex. 12 at 2.  Pain may be exacerbated by cold, anxiety, and stress.  *Id.*

---

[12] Petitioner filed Dr. Kinsbourne's initial expert report during the entitlement phase of the case as Exhibit 8.  Petitioner filed a supplement expert report by Dr. Kinsbourne during the damages phase of the case as Exhibit 42.  Although the undersigned has reviewed both reports, she references only those sections relevant to Ms. Schettl's pain and suffering and to her prognosis, which are relevant to her claim for future pain and suffering.  Dr. Kinsbourne, who received his medical degree from Oxford University, has held a variety of academic positions in pediatrics, neurology, and psychology over the course of his long career.  Pet. Ex. 9 at 1-2.  He currently serves on the editorial boards of a number of publications, including the Archives of Clinical Neuropsychology, Acta Neuropsychologica, and Cognitive Neuropsychiatry.  *Id.* at 3.  Dr. Kinsbourne is licensed to practice medicine in the United Kingdom, Canada, North Carolina, Massachusetts, and Virginia.  *Id.* at 1.

Hypersensitivity may be present and increased with pain on exposure to cold. *Id.* A person with the condition by also have "an increased response to painful stimuli." *Id.*

Most CRPS patients experience a progression of the area affected. Pet. Ex. 14 at 6. The literature suggests that there are three patterns of progression, or spread: contiguous, independent, and mirror-image. Pet. Ex. 12 at 2-3. Contiguous spread is "characterized by the gradual enlargement of the area affected" and mirror-image spread involves symptoms that occur "in the opposite limb in a region similar to the site of initial presentation." *Id.* at 2-3. In his expert report, Dr. Kinsbourne opines that Ms. Schettl had contiguous spread into her right arm and mirror-image spread in her left arm. Pet. Ex. 8 at 5. Dr. Kinsbourne's opinions in this regard are consistent with Ms. Schettl's medical records and her testimony as to the spread of her pain.

Those with CRPS may experience "associated symptoms of psychologic distress" including "[a]nxiety, depression, fear, [and] anger." Pet. Ex. 12 at 3. In spite of their pain, many persons with CRPS continue to work full-time. In a five-year retrospective study of patients with CRPS in the upper extremities published in 1998, 72% reported that they continued to work full time. *Id.* at 6. However, in another retrospective study published in 2009 by Schwartzman, et al., 81% of patients reported that they stopped working due to pain, although of these, 27% eventually returned to work. Pet. Ex. 14 at 5.

Prognosis is variable, but in general is believed to be "poor when symptoms become chronic."[13] Pet. Ex. 12 at 6. In the Schwartzman study of 656 patients who had CRPS for at least one year, the duration of the condition ranged from one to 46 years. Pet. Ex. 14 at 1. None of the patients experienced spontaneous recovery or remission. *Id.* at 6. The pain was "refractory showing only modest improvement with most current therapies." *Id.* Citing the Wertli article, Dr. Kinsbourne opined that there are "numerous features of Ms. Schettl's condition" that are associated with a negative or poor prognosis, including "sensory disturbances and disease duration > 1 year." Pet. Ex. 8 at 8. Moreover, Dr. Kinsbourne states that Ms. Schettl had tried many different treatments without success, and "[t]hus far her severe neuropathic pain has proved to be intractable. Based on evidence that is currently available, her outlook is bleak and one cannot foresee any end to her pain disorder." Pet. Ex. 42 at 2. He opines that Ms. Schettl's "prognosis for recovery . . . is bleak." Pet. Ex. 8 at 8.

### III.   Party Contentions

Petitioner seeks $250,000.00 for past pain and suffering and emotional distress, which is the statutory cap set by § 15(a)(4). Pet. Memorandum ("Memo") (ECF No. 126) at 5. In the alternative, if the undersigned finds that $250,000.00 is an excessive award for past pain and suffering, petitioner asks that the undersigned "award future pain and suffering for years into the future, until the statutory cap [has been] reached." *Id.* For instance, if the undersigned were to determine that an award of $200,000.00 is appropriate for past pain and suffering, then petitioner

---

[13] Based on the Wertli study, however, there does not appear to be a consensus by experts in the field as to what factors or characteristics are associated with a poor prognosis. *See* Pet. Ex. 16 at 5-6.

would recommend that she also award $20,000.00 per year for future pain and suffering for 2019, 2020, and 2021, noting that the future amounts would be reduced to net present value for an award "somewhat less than $250,000." *Id.* at 6. Citing *Graves*, petitioner asserts that "pain and suffering is not somehow worth less because it is being suffered by a vaccine recipient." *Id.* at 4; *see also Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

Respondent proposes an award of $160,000.00 for actual and future pain and suffering damages. Resp. Response (ECF No. 139) at 6-7. Citing two other CRPS cases, *Shaffer* and *Dedon*, respondent suggests that $160,000.00 is "consistent with pain and suffering awards in prior conceded CRPS cases." *Id.* at 7. Respondent's recommendation takes into consideration petitioner's claim that her quality of life has been "impacted by CRPS" but also weighs the "objective evidence contained in petitioner's medical records, which do not document that petitioner is disabled as a result of her CRPS or that it will more likely than not progressively worsen to render her disabled." *Id.*

## IV. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-92V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Medical records are the most reliable evidence regarding a petitioner's medical condition and the effect it has on her daily life. *Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 537-38 (2011) ("There is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections.").

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *See I.D. v. Sec'y of Health & Human Servs.,* No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. Apr. 19, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. [14] *See I.D.*, 2013 WL 2448125, at *9; *McAllister v. Sec'y of Health & Human Servs.,* No 91-103V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995).

The undersigned may also look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering this case. *See, e.g.*, *Jane Doe*

---

[14] In this case, awareness of the injury is not in dispute. The record reflects that at all relevant times petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, the undersigned's analysis will focus principally on the severity and duration of petitioner's injury.

11

*34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). And, of course, the undersigned also may rely on her own experience adjudicating similar claims. *See Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves*, 109 Fed. Cl. 579. In *Graves*, Judge Merow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Id.* Judge Merow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 559-90. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595.

## V.     Discussion

Using Judge Merow's guidance in *Graves*, the undersigned has reviewed other awards of pain and suffering in cases where petitioners have suffered CRPS after vaccination. These cases include the two cited by respondent, *Shaffer* and *Dedon*. In *Shaffer*, the petitioner was awarded $150,000.00 for pain and suffering, and in *Dedon*, the petitioner was awarded $140,000.00. *Shaffer v. Sec'y of Health & Human Servs.*, No. 16-1092, 2017 WL 3599661 (Fed. Cl. Spec. Mstr July 21, 2017); *Dedon v. Sec'y of Health & Human Servs.*, No. 14-553V, 2014 WL 7495978 (Fed. Cl. Spec. Mstr. Dec. 17, 2014). However, both decisions were based upon stipulations, and neither decision contains facts or circumstances about the respective petitioner's pain and suffering. There are additional CRPS decisions, also based on stipulations, where the pain and suffering awards range from $166,991.00 to $238,074.05.[15] The cases at the higher end of the range presumably reflect those petitioners who have suffered the most severe pain. While these ranges provide some information, the paucity of facts do not allow the undersigned to draw any conclusions about whether the numbers are applicable to the facts and circumstance of Ms. Schettl's case.

It is also difficult to evaluate Ms. Schettl's case using similar CRPS injury claims based on jury verdicts for pain and suffering in tort cases, because the facts and circumstance are so

---

[15] These included: *Jenerou v. Sec'y of Health & Human Servs.*, No. 11-173V, 2011 U.S. Claims LEXIS 1209 (Fed. Cl. Spec. Mstr. Sept. 11, 2012) ($160,991.00); *Ibrahim v. Sec'y of Health & Human Servs.*, No. 09-450V, 2010 U.S. Claims LEXIS 211 ($185,841.47); *Phillips v. Sec'y of Health & Human Servs.*, No. 15-115V, 2016 U.S. Claims LEXIS 795 (Fed. Cl. Spec. Mstr. May 23, 2016) ($192,439.12); *Perkins v. Sec'y of Health & Human Servs.*, No. 13-739V, 2015 U.S. Claims LEXIS 496 (Fed. Cl. Spec. Mstr. Apr. 1, 2015) ($220,396.24); *Brown v. Sec'y of Health & Human Servs.*, No. 13-594V, 2017 U.S. Claims LEXIS 314 (Fed. Cl. Spec. Mstr. Mar. 15, 2017) ($238,074.05).

widely variable. For example, in *Britt v. Einhorn*, the jury awarded Ms. Britt $10,000.00 for pain and suffering after she suffered CRPS[16] following a motor vehicle accident. No. 06-5810, 2009 WL 536882 (D.N.J. Feb. 27, 2009). Surveillance footage showed Ms. Britt engaging in daily activities that contradicted her claims of "unremitting pain and disability." *Id.* at *6. On the other end of the spectrum, in *Shashoua v. Otis Elevator Company*, Ms. Shashoua was awarded $722,500.00 after she tripped and fell entering an elevator that was three to five inches higher than the floor of the lobby, injuring her left foot, which resulted in CPRS. No. 95-4735, 1996 WL 684237 (E.D. Pa. Nov. 19, 1996). Ms. Shashoua was a 21 year old student and paralegal at the time of the accident. *Id.* at *3. Her treating physician testified that her condition was probably permanent and that she would likely have symptoms in the future. *Id.* At the time of the verdict, the plaintiff was a lawyer working full-time. *Id.* These two cases illustrate that jury verdicts can yield widely divergent results and as such, it is difficult to extrapolate meaningful information from them.

With regard to severity, there is no question that Ms. Schettl has suffered a significant and painful injury. There are repeated references in her medical records from a number of different providers where she consistently compared her pain to being punched in the arm. At times, she described the pain as hot and burning, or searing. The pain has limited her ability to perform all activities of daily living, physical activity, socializing, hobbies, and leisure activities. Although there are references in the medical records from 2012 stating that Ms. Schettl was participating in some recreational activities, records from 2013 and later demonstrate that she is no longer able to engage in those leisure activities. Dr. Hoelzer, a pain specialist, diagnosed Ms. Schettl with "severe intractable neuropathic pain." Pet. Ex. 3 at 38.

Throughout the last seven years, Ms. Schettl has self-reported her pain at ranges from 2/10 to 7/10. She is hypersensitive to touch and vibration, and "exquisitely sensitive to cold temperatures," which is problematic given where she lives and works. She has reported severe sleep disturbances. She has seen numerous doctors and undergone every recommended treatment, some of which were painful, but none of the treatments or therapies were successful. Similarly, she has tried many different medications, again with limited success.

As for duration, Ms. Schettl has been in pain since October 4, 2011, the date of her vaccination. In 2013, Dr. Bengtson opined that her pain was likely to continue. Due to the chronicity of her pain, she has been diagnosed with an adjustment disorder with mixed anxiety and depression. While she has reported being happy 75% of the time, she has also experienced sadness, anger and anxiety related to her pain. She has stated that her pain "steals her joy." Both her primary care nurse and Dr. Kinsborne have opined that her prognosis for recovery or remission of her pain is poor.

---

[16] The *Britt* opinion does not state the location of Ms. Britt's CRPS, but the inference is that it involved one of her upper extremities. Also, there was testimony that Ms. Britt declined to undergo a procedure which may have improved her pain, a stellate ganglion block, which may have affected the verdict. *See* 2009 WL 536882, at *1. Ms. Schettl underwent that same procedure twice, without relief.

### VI. Conclusion

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating pain and suffering in other cases. In light of the above analysis, and in consideration of the record as a whole, the undersigned finds that petitioner should be awarded $200,000.00 in compensation for actual (or past) pain and suffering and $10,000.00 per year reduced to net present value, for the rest of her life expectancy, for future pain and suffering. Ms. Schettl's date of birth is September 9, 1967, and her remaining life expectancy is approximately 33 years. Thus, her future pain and suffering damages total approximately $330,000.00, prior to conversion to net present value.

**Therefore, Ms. Schettl is awarded $200,000.00 for actual pain and suffering and $50,000.00 for future pain and suffering.**

**The parties are to file a joint status report no later than 30 days after the current government shutdown ends, (1) converting the undersigned's award of future pain and suffering to its net present value, and (2) reporting on all outstanding items of damages that remain unresolved. A separate order will issue on the question of whether Ms. Schettl's Vaccine Program award shall be set off by her settlement proceeds. Once these issues have been resolved, a damages decision will issue.**

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Chief Special Master
